COUNTY OF LOS ANGELES, CALIFORNIA, Plaintiff,

v.

William T. COLEMAN, Jr., Secretary of Transportation of the United States, et al., Defendants.

Civ. A. No. 76–1890.

United States District Court, District of Columbia.

Nov. 24, 1976.

Charles S. Rhyne, William S. Rhyne, Donald A. Carr, and Richard J. Bacigalupo, Washington, D. C., for plaintiff; Ronald L. Schneider, Principal Deputy County Counsel, County of Los Angeles, Los Angeles, Cal., on brief.

Robert M. Werdig, Jr., Asst. U. S. Atty., Washington, D. C., for defendants; Robert B. Donin, Arthur R. Silen, Stanley H. Abramson, Attys., Dept. of Transp., on brief.

## MEMORANDUM

GASCH, District Judge.

This action arises under the Federal-Aid Highway Act of 1956 ("Highway Act"), as amended, 23 U.S.C. §§ 101 *et seq.,* the Urban Mass Transportation Act of 1964, as amended, 49 U.S.C. §§ 1601 *et seq.,* and certain regulations[1] issued by the defendant Secretary of Transportation ("the Secretary") pursuant to these Acts. Plaintiff is a political subdivision of the State of California ("State") and the potential beneficiary of monies distributed by the Secretary in accordance with the above-mentioned legislation. It claims that the Secretary has unlawfully exceeded his rule-making power through the promulgation of recent regulations governing the distribution of these funds, the result of which is that plaintiff has allegedly suffered and continues to suffer irreparable injury in connection with the delayed funding or the non-funding of its transportation improvement projects. Plaintiff seeks both declaratory and injunctive relief and properly invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1331, 5 U.S.C. §§ 701 *et seq.,* and 28 U.S.C. § 1361.

Presently before the Court is plaintiff's motion for a preliminary injunction ordering the Secretary to "immediately consider and approve all projects included on the annual element of Plaintiff County's Fiscal Year 1976–77 Transportation Improvement Program . . . subject only to the conditions of 23 U.S.C. §§ 101(c) and 109."[2]

Subsequent to oral argument, the parties agreed to submit this matter to the Court for final adjudication of the merits and to treat plaintiff's motion as one for permanent injunctive relief. For the reasons briefly set forth below, the Court finds that plaintiff's motion for a permanent injunction should be denied and that the case should be dismissed.

## THE FACTS

The Federal-Aid Highway Act of 1956, as amended by the Highway Acts of 1960, 1962, 1965, 1966, 1968, 1970, 1973, 1975, and 1976 (codified in Title 23), establishes procedures by which the Federal Government cooperates with the states and their political subdivisions to fund each state's program of highway improvement projects. Under its "trust fund" concept, a specified percentage of certain highway use taxes are received into the United States Treasury and then apportioned to the states by the Secretary as specified by law. 23 U.S.C. § 104(b). Certain portions of these funds are specifically earmarked by statute for the urban areas within each state, in amounts determined by the ratio which the population of each state's urban areas bears to the urban population of all other states. 23 U.S.C. §§ 104(b)(3), 104(f)(2). Accordingly, plaintiff Los Angeles County was apportioned ten and one-half million dollars for the fiscal years 1974, 1975, and 1976 under the Highway Act of 1973. Pursuant to statute, these apportioned funds remain available for expenditure for a period of three years after the close of the fiscal year for which they were authorized. 23 U.S.C. § 118(b).

The Highway Act of 1962 originated what has become known as the "3–C planning process" ("continuing, comprehensive and cooperative process") by the enactment of section 134 of Title 23. As amended by the Highway Act of 1970, section 134(a) provides as follows:

---

1. 40 Fed.Reg. 42976, September 11, 1975.

2. Plaintiff's Application for a Preliminary Injunction at 1.

It is declared to be in the national interest to encourage and promote the development of transportation systems, embracing various modes of transport in a manner that will serve the States and local communities efficiently and effectively. To accomplish this objective the Secretary shall cooperate with the States, as authorized in this title, in the development of long-range highway plans and programs which are probably coordinated with plans for improvements in other affected forms of transportation and which are formulated with due consideration to their probable effect on the future development of urban areas of more than fifty thousand population. After July 1, 1965, the Secretary shall not approve under section 105 of this title any program for projects in any urban area of more than fifty thousand population unless he finds that such projects are based on *a continuing comprehensive transportation planning process carried on cooperatively by States and local communities* in conformance with the objectives stated in this section. No highway project may be constructed in any urban area of fifty thousand population or more unless the responsible public officials of such urban area in which the project is located have been consulted and their views considered with respect to the corridor, the location and the design of the project.

23 U.S.C. § 134(a) (emphasis added). Similar language is to be found in the Urban Mass Transportation Act of 1964, 49 U.S.C. § 1604(1), which also governs the funding of urban transportation projects.

The Secretary has delegated jointly to the Administrators of the Urban Mass Transit Administration ("UMTA") and the Federal Highway Administration ("FHWA") his authority to administer the Highway Act legislation in accordance with Title 23. 29 C.F.R. §§ 1.48, 1.51. After Congress enacted section 134(a) as part of the Highway Act of 1973, the Administrators of these agencies sought to promulgate regulations which they believed necessary to implement the "3–C Process" mandated by that statute. Accordingly, UMTA and FHWA published a notice of proposed rulemaking on November 3, 1974.[3] After careful review of, and accommodation to, the comments received from over 120 interested groups and individuals, final regulations, along with an extensive preamble statement, were published on September 11, 1975, and took effect on October 17, 1975.[4]

These regulations, found in 23 C.F.R. Part 450 and 49 C.F.R. Part 613, are generally referred to by the parties as the Secretary's Transportation Improvement Program ("TIP") regulations. They provide, in short, for all urban transportation projects funded by the Secretary to be selected and proposed by regional planning authorities, referred to by Congress as "metropolitan planning organizations" ("MPOs"), to be designated by the states.[5] These MPOs are designed to be the focus of the "3–C" planning process for each urban area; their responsibilities include the development of a multiyear program of transportation improvements (a "TIP Plan"), as well as an "annual element" of proposed transportation projects for each fiscal year. 23 C.F.R. §§ 450.112, 450.114, 450.116, 450.118, 450.-120. What this means is that each State-designated MPO now holds the sole responsibility for developing (soliciting from its member municipalities), endorsing, and submitting to the Secretary (through the State) all project requests for the use of those Highway Trust Funds apportioned to the urban subdivisions within its regional jurisdiction. 23 C.F.R. §§ 450.312, 450.316. This function is generally referred to by the parties as "programming."

---

**3.** 39 Fed.Reg. 39660, November 8, 1974.

**4.** *See* note 1 *supra.*

**5.** 23 C.F.R. § 450.112. As part of the Highway Act of 1973, Congress referred to "the metro-

politan planning organizations designated by the State as being responsible for carrying out the provisions of section 134 of this title." 23 U.S.C. § 104(f)(3).

As determined by statute,[6] the Secretary provides federal assistance for only those projects which are forwarded to him by the State. The Secretary's TIP regulations require that these projects be submitted to the State by the appropriate MPO as part of its "annual element." 23 C.F.R. §§ 450.-310, 450.316. To satisfy the "planning mandate" of Congress as expressed in section 134(a) (and in the corresponding sections of the Urban Mass Transportation Act[7]), UMTA and FHWA annually certify the existence of a "3–C Process" (i. e., a properly developed TIP Plan) in each urban area. 23 C.F.R. § 450.320.

The State of California has designated the Southern California Association of Governments ("SCAG") as the MPO for the Los Angeles - Long Beach urbanized area.[8] As such, it has the responsibility for formulating the multiyear TIP Plan for that region as well as the annual element of project requests which it forwards to the State for submission to the Secretary. To put together this annual program package, SCAG reviews the project proposals of its member municipalities for consistency with its TIP Plan, assembles appropriate projects, and forwards the package to the State with its endorsement.

As mentioned above, no transportation project may be funded by the Secretary unless it is part of the statewide "program of elements" (a cumulation of MPO elements) approved by the State and forwarded to the Secretary. 23 U.S.C. §§ 105(a), 106(a), 145. It is thus the State's ultimate responsibility to select those urban projects submitted to the Secretary for funding (23 U.S.C. § 145; 23 C.F.R. § 450.318(b)), just as it is the State's responsibility to select—or, if necessary, to replace—each MPO. 23 C.F.R. §§ 450.106, 450.108. Once the State submits its endorsed annual program of projects to Washington, the Secretary may approve it in whole or in part, 23 U.S.C. § 105(a), but he may not approve any project for an urban area which is not part of the annual element developed by that urban area's duly-designated MPO. 23 U.S.C. § 105(a); 23 C.F.R. § 450.318(a).

SCAG's first annual element (75–76) covered the six-month period from January 1, 1976 to June 30, 1976; the Secretary asserts that it was amended in April, 1976 "to include the specific projects belatedly requested by plaintiff County." (Defendants' Memorandum at 11). SCAG's second annual element, covering the 1976–77 fiscal year, was not part of the program of projects which was forwarded to the Secretary by the State on October 1 of this year; this was apparently due to the fact that SCAG (as well as one other California MPO) had not submitted its second annual element to the State by that date, despite the fact that plaintiff county submitted *its* project requests to SCAG in May. (Defendants' Memorandum at 11; Complaints ¶ 20). The Secretary has since approved the State's program of projects "subject to acceptance of the 76–77 annual elements from the remaining areas," and says that the overdue annual elements are "expected shortly." (Defendants' Memorandum at 11).[9]

---

6. *See* 23 U.S.C. §§ 105(a), 106(a), 145.

7. *See* 49 U.S.C. §§ 1602(a)(2), 1604(g), and 1604(1).

8. SCAG presently represents over 120 cities in six counties—Los Angeles, Orange, Riverside, San Bernadino, Venture and Imperial. It was formed in 1965 as a voluntary association of local governments in order to provide a regional forum through which its member municipalities could coordinate their participation in federal aid programs. Ever since its designation in 1967 as an "areawide clearinghouse" by the Office of Management and Budget, SCAG has annually reviewed federal grant applications totalling over one billion dollars in all areas of federal program funding (SCAG's function in this regard is commonly referred to as "A–95 review," after the OMB Circular A–95 which established project review guidelines for such intergovernmental bodies.)

9. The Secretary has submitted the affidavit of a SCAG official which indicates that an "advance copy" of SCAG's 1976–77 annual element was submitted to the State on October 8, 1976. Affidavit of Barton R. Maeys, Acting Executive Director of SCAG at 4, Defendants' Exhibit 3.

As of the date of oral argument in this case, November 11, neither party had any additional knowledge concerning the forwarding of SCAG's annual element to the State or, ultimately, to the Secretary by the State. *But see* note 31 *infra*.

A number of plaintiff's proposed construction projects either have been, or continue to be, substantially delayed in their funding and commencement allegedly as a result of the Secretary's TIP regulations requiring MPO (SCAG) processing and endorsement of all project proposals. (Complaint, ¶¶ 14–16, 18–19; Plaintiff's Memorandum at 9–12). In fact, it would appear that this delay is in no small part due to SCAG's inability to forward its current annual element to the State in a timely fashion.[10] Underlying plaintiff's challenge to the Secretary's TIP regulations, however, is the undisputed fact that prior to their existence plaintiff County would have exercised, under a cooperative agreement with the State,[11] what is now exclusively an MPO function (i. e., "programming") not only for itself, but on behalf of numerous other municipalities (i. e., cities within Los Angeles County) as well. (Complaint, ¶ 9; Plaintiff's Memorandum at 4).

## THE MERITS

■ Plaintiff challenges the lawfulness of the Secretary's TIP regulations, alleging that they are both unconstitutional and contrary to the intent and authorization of Congress. It seeks a declaratory judgment to that effect, as well as the immediate mandatory injunctive relief described above.[12] In opposition, the Secretary contends that his TIP regulations are entirely lawful and argues further that plaintiff has

failed to meet the criteria for preliminary injunctive relief as set forth in *Virginia Petroleum Jobbers Association v. Federal Power Commission,* 104 U.S.App.D.C. 106, 259 F.2d 921, 925 (1958). Because the Court holds that the challenged regulations are lawful, and moreover does so in the context of plaintiff's motion for permanent injunctive relief, the Court need not reach the issue of whether plaintiff has satisfied the remaining requirements for preliminary injunctive relief.[13]

Plaintiff County presents numerous arguments in support of its contention that the Secretary's TIP regulations are unlawful. Its central and strongest argument is that these regulations make changes in the structure of project programming which were not contemplated by Congress, which are not authorized by section 134(a),[14] and which violate the general statutory scheme of Title 23.[15] In support of this argument, plaintiff first correctly points to the fact that the only statutory reference to an MPO appears at 23 U.S.C. § 104(f)(3), added by the amendments in the Highway Act of 1973; plaintiff describes this section as one which merely "designates the MPO as the recipient of planning funds." [16] In this section, however, Congress has said substantially more than plaintiff indicates, inasmuch as it describes the MPOs as "the metropolitan planning organizations designated by the State as being responsible for carrying out the provisions of section 134 of this title." 23 U.S.C. § 104(f)(3). The

---

**10.** *See* note 9 *supra* and accompanying text.

**11.** *See* Plaintiff's Memorandum at 19, *citing* 23 U.S.C. § 145.

**12.** *See* note 2 *supra* and accompanying text. Plaintiff seeks an order compelling the Secretary immediately to accept and consider plaintiff's project requests upon plaintiff's direct submission, thereby evading not only the Secretary's TIP regulation requirement of intermediate MPO approval, but also effectively bypassing the requirement of State endorsement which existed even prior to the Secretary's TIP regulations. *See* note 6 *supra* and accompanying text.

**13.** The Court does observe, however, that plaintiff has not made a persuasive showing of irreparable injury. It probably would not have

been successful in its original request for a preliminary injunction *even if* it had been able to demonstrate that it was likely to prevail ultimately on the issue of the lawfulness of the Secretary's regulations.

**14.** 23 U.S.C. § 134(a).

**15.** Plaintiff points to several sections of Title 23 at which, plaintiff says, Congress has "evidence[d] its intent" that the Highway Act be administered without any unnecessary "delay or red-tape." Plaintiff's memorandum at 4; *see, e. g.,* 23 U.S.C. § 101(b), (e).

**16.** Plaintiff's memorandum at 19.

Court finds that the clear language of this section, when read in conjunction with that of section 134, provides convincing authority in support of the Secretary's regulations.

Plaintiff next argues that the Secretary's creation of MPOs with full programming authority effectively precludes the authority and control which municipalities such as itself had previously exercised and therefore amounts to a "radical and disruptive concept" [17] which was not intended by Congress and is wholly unnecessary to implement the provisions of section 134(a). Plaintiff says that it cannot cite any legislative history illustrating the inclinations of Congress since there is none, "because Congress never intended that the MPO ever have anything more than a planning role." [18] All plaintiff can point to by way of support for this position are the adverse comments filed by the House and Senate Public Works Committees at the time that the challenged regulations were first proposed. [19] Far more persuasive to the Court, however, is the fact that Congress has had ample opportunity to review the exercise of rulemaking power undertaken by the Secretary, as embodied in the regulations challenged herein, and to legislate unequivocally to the contrary if this were believed

necessary. [20] In fact, as the Secretary accurately points out, "the controversial nature of the TIP regulations was recognized by Congress during deliberations on the 1976 highway legislation," [21] resulting in the enactment of section 149 of the Federal-Aid Highway Act of 1976. [22] This statute directs the Secretary to conduct a detailed study of the implementation of the "3–C" planning process, including "[a]n analysis of the various types of organizations now in being which carry out the planning process required by section 134 of title 23, United States Code." [23]

Plaintiff, too, is very attuned to this development; in fact, it attempts to make much of the fact that perhaps the majority of the data obtained through this study to date would seem to support plaintiff's contentions that the challenged regulations "will produce the antithesis of the cooperative planning process mandated by the Act," and furthermore "are unworkable." [24] Yet the Secretary's rebuttal point nevertheless remains persuasive: if Congress felt so strongly that the Secretary's regulations violated the statutory scheme of Title 23, why did it not respond with stronger corrective action? In the Court's view, the most decisive factor here is that

17. *Id.* at 20.

18. *Id.*

19. Complaint Exhibits 14 and 15. Although the comments do indicate that the views of the respective Chairman of the House Public Works and Transportation Committee and the Senate Public Works Committee were in many respects adverse to certain aspects of the Secretary's TIP regulations, they hardly rise to the level of pertinent legislative history demonstrating the intent of Congress as a whole at the time that section 134 was enacted. Certainly, they do not constitute a sufficient basis, particularly when controverted by other manifestations of Congressional inclination, for this Court to declare the challenged regulations to be unlawful. *See* notes 20–23 *infra* and accompanying text.

20. As described *supra,* the challenged regulations were first proposed in November of 1974 and were ultimately published in September of 1975. *See* notes 3–4 *supra* and accompanying text.

21. Defendants' memorandum at 23 & n. 18.

22. Pub.L. No. 94–280, 90 Stat. 425, May 5, 1976.

23. *Id.* Congress provided that the study was to be submitted to it "within six months of the enactment of this section." *Id.*

24. *See* plaintiff's memorandum at 21–28. Plaintiff points to a number of urbanized areas in which the Secretary's TIP regulations have reportedly presented practical difficulties of one kind or another. *Id.* At oral argument, plaintiff sought to focus upon the urbanized area of Omaha, Nebraska - Council Bluffs, Iowa, where it would appear that the Secretary's agents decided to implement an accommodation of its TIP regulations as a result of certain considerations peculiar to that area. *Id.* at 27. The Court fails to see, however, how these instances of admitted practical difficulties should lead it to declare that the Secretary's regulations are unlawful.

Congress not only was aware of the potential practical problems posed by the challenged regulations, but moreover has already acted to address those concerns in the manner which it apparently deems to be most appropriate.[25] Certainly, Congress' refusal to alter or amend the Secretary's TIP regulations when enacting the Federal-Aid Highway Act of 1976 is persuasive evidence that the Secretary's regulations are proper.[26] Plaintiff has advanced no compelling basis upon which this Court should interfere with what is demonstrably a policy and administrative matter currently under careful congressional and administrative review.[27]

The essence of plaintiff's complaint is that its construction projects have not yet been funded because of the procedures and requirements mandated by the Secretary's TIP regulations.[28] Yet it appears to the Court that the true delay suffered by plain-

25. See notes 20–23 supra and accompanying text.

26. See Red Lion Broadcasting Company, Inc. v. F. C. C., 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); Zemel v. Rusk, 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); F. H. A. v. The Darlington, Inc., 358 U.S. 84, 90, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958); Costanzo v. Tillinghast, 287 U.S. 341, 345, 53 S.Ct. 152, 77 L.Ed. 350 (1932).

27. Plaintiff advances a number of additional arguments which are interesting but not particularly persuasive. First, it contends that the Secretary's rulemaking "violates the federalism scheme of the United States Constitution and the 10th Amendment thereto." Plaintiff's memorandum at 34. Plaintiff here appears to argue that the regulations somehow emasculate its sovereignty and do severe damage to our precious notions of federalism and it seeks to extend the Supreme Court's recent holding in National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), to this case. What plaintiff overlooks, however, is the fact that the ultimate responsibility for the submission of projects to the Secretary rests with the State; it rested there prior to the issuance of the challenged regulations and it continues to rest there at present. See 23 U.S.C. §§ 105(a), 106(a), and 145; 23 C.F.R. §§ 450.316, 450.318. Inasmuch as the Secretary's regulations in no way diminish the power of the State, plaintiff's "federalism" argument (even if it were the proper party to advance it) must fail.

Plaintiff also imaginatively argues that the Secretary's regulations leave municipal units such as itself "exposed to tort liability for decisions they no longer have the power to make." Plaintiff's memorandum at 29. Yet plaintiff has cited no case in which a municipality has been held liable under such circumstances; it is doubtful that such an admittedly "bizarre result" would ever occur. At a similar level of speculation, plaintiff also argues that the Secretary's regulations force it to violate that portion of the California State Constitution (Article XIII, Section 40) which precludes plaintiff from incurring in any one year a total fiscal obligation in excess of its revenues. In this connection, plaintiff appears to argue that MPO processing of its project proposals will somehow hamper its ability to act as a fiscally responsible municipality in accordance with the laws of the State of California. Whatever the relative merits of this assertion, however, it is hardly pertinent to the crucial central question of whether the Secretary's regulations constitute an unlawful exercise of his rulemaking power.

Finally, plaintiff attempts to have the Court view this action as an "impoundment" case. Its own language, however, serves to defeat this position. Plaintiff argues as follows:

Since the TIP regulations go beyond the authority granted the Secretary in the Act, the failure of the Defendants to approve these projects because they were not included in a TIP, and Defendants' failure to obligate funds for these projects is the functional equivalent of executive impoundment,

. . . . .

Plaintiff's memorandum at 37 (emphasis added). Thus plaintiff blithely premises this "impoundment" argument upon its favorable determination of the central question presented in this case; its argument is of necessity constructed upon the unproven premise that the Secretary's regulations exceed his authority and are therefore unlawful. In this same way, plaintiff's reliance upon the recent case of City of Los Angeles v. Coleman, 397 F.Supp. 547 (D.D.C.1975), is misplaced. There Judge Parker found that the Secretary's failure to authorize certain monies under the Airport and Airway Development Act constituted an improper withholding of funds, but did so only after holding that the Secretary had in that case grossly misinterpreted the applicable Act. See 397 F.Supp. at 556. Plaintiff has not persuasively advanced a parallel finding in the instant case.

28. At oral argument, plaintiff's counsel stated plaintiff's position as follows:

The only thing we are objecting to is that everybody has got their money except Los Angeles, and they don't tell us why.

Transcript at 48, November 11, 1976.

tiff results from the inability of the duly-designated MPO for plaintiff's region (SCAG), of which plaintiff is a municipal member,[29] to efficiently process and forward its annual element to the Secretary through the State.[30] Whatever the reason for this delay, it now appears that it is a temporary situation [31] and that the Secretary is carefully studying the very problems and concerns for which plaintiff seeks redress in the instant litigation.

The Secretary has promulgated, pursuant to his broad rulemaking power [32] regulations which he feels are vital to the proper implementation of the congressional mandate contained in sections 134(a) and 104(f)(3) of Title 23. In the absence of any compelling indication to the contrary, the Court holds that these regulations are lawful. Whether they should be altered or amended is a matter best left to the legislative branch, not the judiciary. Plaintiff's motion for a declaratory judgment and a permanent injunction should therefore be denied and the case should be dismissed.

---

**29.** *See* note 8 *supra* and accompanying text.

**30.** *See* note 9 *supra* and accompanying text.

**31.** The Court notes that at oral argument neither party's counsel could pinpoint the current location and cause of this administrative bottleneck. *See* note 9 *supra*. Information subsequently filed with the Court indicates that SCAG's 76–77 annual element was received by the Secretary's agents in California on November 10 and has been given immediate consideration. Affidavit of Edward C. Muse, Director of the Office of Planning and Research, Federal Highway Administration, Region 9, San Francisco, California at 5.

**32.** Congress has conferred the Secretary with the power to "prescribe and promulgate all needful rules and regulations for the carrying out of the provisions of this title." 23 U.S.C. § 315.