**NISH and Goodwill Services, Inc., Plaintiffs,**

v.

**William S. COHEN, Secretary of Defense, et al., Defendants.**

**Civil Action No. 99–1632–A.**

United States District Court, E.D. Virginia, Alexandria Division.

April 25, 2000.

---

John S. Pachter, Vienna, VA, for Plaintiffs.

Andrew D. Freeman, Baltimore, MD, for Intervenors.

John A. Drennan, for Defendants.

## MEMORANDUM OPINION AND ORDER

LEE, District Judge.

This case involves interpretation of the Randolph–Sheppard Act ("R–S Act" or "Act") and its applicability to appropriated fund contracts for cafeteria and military mess hall services. *See* 20 U.S.C.A. §§ 107–107f (West 2000). The issue for the Court is whether the inclusion of the term "cafeteria" in the 1974 Amendments to the R–S Act created a priority for blind vendors to operate military mess halls and a corresponding exception to government procurement law that normally requires government agencies to acquire goods and services through full and open competition. The matter is currently before the Court on cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure ("FRCP") 56. Plaintiffs NISH and Goodwill Services, Inc. ("Plaintiffs"), in their motion, insist that neither the R–S Act nor its 1974 Amendments intended the inclusion of procurement programs for the operation of military mess halls; interpretation as such, Plaintiffs claim, violates the Competition in Contracting Act ("CIC Act"). In contrast, Defendants Department of Defense ("DOD") and Department of the Army ("DOA", collectively "Defendants"), along with Intervenors,[1] contend

---

1. There are seven such groups: (1) Randolph–Sheppard Vendors of America; (2) American Council of the Blind; (3) National Educational and Legal Defense Services for the Blind; (4) Virginia Facilities Vendors Council; (5) National Federation of the Blind; (6) Texas Commission for the Blind; and (7) Oklahoma Department of Rehabilitation Services. The Court, in a previous Memorandum Opinion and Order, allowed each to intervene in the present action pursuant to certain restrictions contained in that same Order. *See*

that the R–S Act's priority for blind vendors applies to *all* cafeterias on federal property, including military mess halls. For the reasons stated below, the Court holds that, as a matter of law, addition of the term "cafeteria" to the R–S Act, when viewed in conjunction with corresponding regulations and available case law, supports the R–S Act's coverage of the military mess hall services at Fort Lee, Virginia.

## I. BACKGROUND

The R–S Act is a federal statute designed to ensure that the maximum number of vending facilities are operated by licensed blind individuals on federal and other property. The R–S Act and its implementing regulations require that one or more vending facilities owned or operated by blind entrepreneurs be established on each federal property. *See id.* § 107(b)(2); 34 C.F.R. § 395.30(a) (1999). The extension of the Act in 1974 to include military dining facilities created, among other things, an opportunity for blind business owners to develop managerial and entrepreneurial skills.

In the present case, Plaintiffs seek a declaratory judgment that the Act does not apply to contracts for the operation of military mess hall services at Fort Lee, Virginia. The United States DOD and DOA are the named Defendants in the suit. Additionally, seven individual groups have intervened on behalf of, and in support of, Defendants. *See supra* note 1.

The government property at the center of the dispute between the parties is Fort Lee, Virginia. In November 1998, Defendant NISH expressed interest in the anticipated replacement contract for the facility. At that time, Fort Lee's food service contracts had not been placed upon the Javits–Wagner–O'Day Act's ("JWOD Act") procurement list. *See generally* 41 U.S.C.A. §§ 46–48c (West 1987 & Supp. 1999). Subsequently, in June 1999, before

Fort Lee had issued a bid solicitation or received a dining facilities proposal from NISH, the Virginia Agency for the Blind contacted officials at the facility to express its interest in bidding for the food services contract at issue under the R–S Act.

With this backdrop, and in an effort to reconcile the application of the R–S Act with the JWOD Act, the contracting officer responsible for providing food service operations at Fort Lee sought assistance from Fort Lee's legal staff, the Army's Training and Doctrine Command ("TRODOC"), and the Office of the Principal Assistant Responsible for Contracting. In addition, the officer consulted a November 12, 1998 memorandum from the General Counsel of DOD addressing the applicability of the R–S Act to DOD military dining facilities, along with Army Regulation 210–25, regarding implementation of the R–S Act. Using these guideposts, the officer determined that the Fort Lee dining facilities were "cafeterias" for purposes of the R–S Act, well within the Act's ambit. Having found that the R–S Act was applicable to Fort Lee's food service requirement, she decided that a negotiated acquisition with NISH was inappropriate. Consequently, NISH filed the present claim in federal court.

## II. STANDARD FOR SUMMARY JUDGMENT

Under FRCP 56, a court should grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c).

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party may not rest upon the mere allegations or

denials of her pleading, but must set forth specific facts showing that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e).

The mere existence of some alleged factual dispute between the parties, however, will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *See id.*

In determining whether a party is entitled to summary judgment, the record is viewed in the light most favorable to the nonmoving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

### III.  DISCUSSION

Having reviewed the facts in this matter in light of the standard for summary judgment under the FRCP, the Court finds this case ripe for judgment as a matter of law.[2] Combining an adherence to traditional rules of statutory construction with duly promulgated regulations and overwhelming governmental support for Defendants' and Intervenors' position, the Court holds that the R–S Act encompasses the military mess hall services at Fort Lee as "cafeterias" on eligible federal property.

### A.  *Standard of Review for Plaintiffs' Claims*

Plaintiffs' claims in this matter are governed by the standard for judicial review

---

2. During oral argument, all interested parties—Plaintiffs, Defendants, and Intervenors—agreed with this statement.

3. This same philosophy applies to the deference that should be afforded an agency's construction of its own *regulations. See Lyng v.*

of administrative actions set forth in the Administrative Procedure Act ("APA"). *See* 5 U.S.C.A. § 706 (West 1996). The APA provides that agency action may be set aside only if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law—or if the action failed to meet statutory, procedural, or constitutional requirements. *See id.*

Where a statute is silent or ambiguous regarding a specific issue, a reviewing court considers whether the agency's interpretation is based on a permissible construction of the statute. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Accordingly, the agency's interpretation of the statute is afforded great deference by the courts and need not be the very best interpretation—so long as it is reasonable. *Cf. Randolph–Sheppard Vendors of America, Inc. v. Harris,* 628 F.2d 1364, 1367–68 (D.C.Cir.1980) ("We may not change or declare illegal a rational scheme prescribed by the expert agency specifically commissioned to devise it"). Moreover, an assessment of the wisdom of the agency's policy choices is a matter generally outside the purview of the judiciary.[3] *See Chevron,* 467 U.S. at 866, 104 S.Ct. 2778; *Harris,* 628 F.2d at 1366.

With this standard of review in mind, the Court turns to the overwhelming evidence in the record supporting Defendants' and Intervenors' position that the R–S Act's coverage of "cafeterias" on eligible federal property encompasses military dining facilities or mess halls such as those at Fort Lee—in addition to concessions and other "vending facilities."[4]

---

*Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986).

4. It is worth noting here that Defendants make a highly-disputed argument with regard to the legislative history of the R–S Act, including the November 1973 testimony of Lt.

### B. Statutes and Regulations in Question

#### 1. The Randolph–Sheppard Act

The R–S Act, 20 U.S.C.A. §§ 107–107f (West 2000), was enacted in 1936 to provide employment opportunities for the blind, and to encourage the economic self-sufficiency of blind individuals. *See Committee of Blind Vendors v. District of Columbia,* 28 F.3d 130, 131 (D.C.Cir.1994) (citing 20 U.S.C. § 107(a)). In 1974, Congress amended the Act in order to expand economic opportunities for the blind, effectively establishing a cooperative federal-state program that gives contracting priority to blind persons operating vending facilities on federal property. *See id.* (citing 20 U.S.C. § 107(a)-(b)). The 1974 Amendments direct the Secretary of the Department of Education ("Secretary", "DOE") to prescribe regulations to ensure that adequate priority is given to licensed blind persons and that, whenever feasible, one or more vending facilities are established on all federal property. *See* 20 U.S.C.A. § 107(b).

The Secretary of DOE oversees implementation of the Act via the Commissioner of the Rehabilitative Services Administration ("Commissioner"). Among the duties assigned to the Secretary is the designation of State Licensing Agencies ("SLA") to issue licenses to blind citizens for operating vending facilities on federal property for the vending of newspapers, magazines, tobacco products, *foods, beverages,* and other items. *See id.* § 107a(a)(5). The term "vending facility" is defined by the 1974 Amendments to include automatic vending machines, *cafeterias,* snack bars, cart services, shelters, counters, and other auxiliary equipment. *See id.* § 107e(7).

While the term "cafeteria" is not defined under the Act itself, DOE and DOD regulations describe such a facility as "food dispensing" and "capable of providing a broad variety of prepared *foods and beverages* (including hot meals) primarily through the use of a line where the customer serves himself from displayed selections." [5] 34 C.F.R. § 395.1(d) (1999) (emphasis added). Moreover, these regulations explain that a cafeteria may be

General Leo E. Benade on behalf of DOD before the congressional Subcommittee on the Handicapped of the Committee on Labor and Public Welfare. *See* Defs.' Br. at 13–14. In that testimony, Lt. General Benade acknowledged that the then-proposed amendments to the R–S Act would give a priority to blind vendor operation of *full food service operations* including *base restaurants* and *mess halls.* Additionally, he expressed concern that the operation and control by various state licensing agencies of *cafeterias, mess halls, and base restaurants* could be disruptive of federal functions. Taking Lt. General Benade's testimony, Defendants argue that, despite his patent references to "cafeterias" and "mess halls," Congress chose neither to delete the term "cafeterias" from the definition of "vending facility" nor insert additional language distinguishing types of military dining facilities so as to exclude mess halls from the scope of the Amendments. This would seem to convincingly support Defendants' and Intervenors' contentions. As Plaintiffs contend in their own submission to the Court, however-er, the legal efficacy of Lt. General Benade's testimony lies in serious question under tradi-

tional notions of legislative history interpretation. Generally, statements made at committee hearings by non-members of Congress are accorded little to no weight in a legislative history analysis. *See* NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 48.10, at 343 (5th ed.1992). In the end, the Court need not decide the issue of the testimony's persuasive effect because, with or without its consideration, the Court holds that military mess hall services, such as those in controversy at Fort Lee, are covered under the auspices of the R–S Act.

5. For comparison purposes, the Act's regulations seem consistent with common dictionary definitions for "cafeteria." For example, a popular nonlegal dictionary defines the term as "[a] restaurant in which the customers are served at a counter and carry their meals on trays to tables." THE AMERICAN HERITAGE DICTIONARY 227 (2d college ed.1991). Another dictionary defines "cafeteria" as "a restaurant, esp. now a self-service restaurant." 2 THE OXFORD ENGLISH DICTIONARY 764 (2d ed.1989) (covering alphabetical words B.B.C.-Chalypsography).

"fully automatic" or with "some limited waiter or waitress service." [6]  *Id.*

The Act also tasks DOE with prescribing regulations establishing priority for the operation of cafeterias when the Secretary determines, after consultation with the head of the appropriate installation, that such an operation can be provided at a reasonable cost with food comparable in quality to that currently provided employees.  *See* 20 U.S.C.A. § 107d–3(e).[7]  These same regulations provide two options by which a federal agency may implement the proposed priority.  First, the federal agency may "[e]stablish the ability of blind vendors to operate a cafeteria ... at comparable cost and of comparable high quality [by inviting SLAs] to respond to solicitations ... when a cafeteria contract is contemplated."  34 C.F.R. § 395.33(b).  Second, the agency may enter into direct negotiations with the SLA to implement the cafeteria priority.  If the SLA's proposal is determined by the federal agency to be competitive and has been ranked among those proposals that have a reasonable chance of being selected for final award, the agency is to consult with DOE.  *See id.* § 395.33(b), (d); *cf.* 32 C.F.R. § 260.3(g)(1)(ii) (1999).  If, however, the proposal is determined not to be within the competitive range, the agency may award

the contract to the most highly-evaluated offeror.  *See* 32 C.F.R. § 260.3(g)(1)(i).  *See generally Matter of: Department of the Air Force—Reconsideration,* 1993 WL 212641, at *7–8 (Comp.Gen.1993).

▮  Finally, as evidence of Congress's recognition of the need to make exceptions under the R–S Act for military facilities, the Act treats certain military-controlled vending facilities differently from vending facilities not under military control for the purpose of regulating the accrual of vending machine income: "Subsections (a) and (b)(1) of this section shall not apply to income from vending machines within retail sales outlets *under the control of exchange or ships' stores systems* authorized by Title 10, or to income from vending machines *operated by the Veterans Canteen Service ....*" 20 U.S.C.A. § 107d–3(d) (emphasis added).  The Act, however, makes no such distinction regarding military-controlled versus nonmilitary-controlled *cafeterias* on federal property.  Instead, it simply indicates that cafeterias are to be considered covered under the Act as "vending facilities." *See* 20 U.S.C.A. § 107e(7).  No such distinction should be read into the Act either, given the fact that omission of language by Congress in one section of a statute that is included in another generally reflects Congress's in-

---

6. The regulations also provide that "table or booth seating facilities are always provided." 34 C.F.R. § 395.1(d) (1999).

7. The corresponding DOE regulations state that [p]riority in the operation of cafeterias by blind vendors on Federal property shall be afforded when the Secretary determines, on an individual basis, and after consultation with the appropriate property managing department, agency, or instrumentality, that such operation can be provided at a reasonable cost, with food of a high quality comparable to that currently provided employees, whether by contract or otherwise.  Such operation shall be expected to provide maximum employment opportunities to blind vendors to the greatest extent possible.

34 C.F.R. § 395.33(a).
  DOD regulations regarding cafeteria contract priorities reflect DOE's:

(ii) If the State licensing agency submits a proposal and it is within the competitive range established by the contracting officer, the contract will be awarded to the State licensing agency except as provided in [another paragraph] of this section.
(iii) The contracting officer may award to other than the State licensing agency when the on-site official determines that award to the State licensing agency would adversely affect the interests of the United States and the Secretary, HEW, approves the determination ... or when the on-site official determines, after conferring with the Head of the DOD Component, and the Secretary, HEW, agrees, that the blind vendor does not have the capacity to operate a cafeteria in such a manner as to provide food service at a comparable cost and of comparable high quality as that available from other providers of cafeteria services.
32 C.F.R. § 260.3(g)(1)(ii)-(iii) (1999).

tentional and purposeful exclusion in the former section. *Cf. Brown v. Gardner,* 513 U.S. 115, 120, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994).

### 2. The Javits–Wagner–O'Day Act

The JWOD Act, 41 U.S.C.A. §§ 46–48c (West 1987 & Supp.1999), established an independent federal agency known as the Committee for Purchase from People Who Are Blind or Severely Disabled ("Committee"). The objective of the Committee is to provide training and employment opportunities for persons who are blind or have severe disabilities. *See Barrier Indus., Inc. v. Eckard,* 584 F.2d 1074, 1076 (D.C.Cir.1978).

The Committee publishes a procurement list consisting of commodities and services that it considers to be suitable for procurement by the government from qualified nonprofit agencies for the blind and handicapped. *See* 41 U.S.C.A. § 47(a)(1). The list is generally a mandatory procurement source for the federal government, i.e., a government agency wishing to obtain a commodity or service listed by the Committee is required to procure the item from the qualified agency at the price established by the Committee. *See id.* § 48.

The JWOD Act provides different opportunities to different groups of people than does the R–S Act. In effect, it provides a "sheltered" environment, *see* Intervenors' Br. at 5, allowing people with disabilities to work for entities like Goodwill Services, Inc. In contrast, the R–S Act encourages blind persons to be entrepreneurial and run their own businesses. Potentially, the two statutes could come together, for example, where a cafeteria managed by a blind vendor pursuant to the R–S Act was staffed, in some capacity, by people provided from a JWOD Act agency.

### 3. The Competition in Contracting Act

Finally, enacted in 1994, the CIC Act, 10 U.S.C.A. § 2304 (West 1998), requires that any expenditure of tax dollars on federal procurements through means other than open competition must be *expressly authorized by statute.* *See id.* § 2304(a)(1). It is this "savings clause" in the CIC Act that illuminates both its inapplicability to the current controversy and the merit of Defendants' and Intervenors' positions with regard to cafeteria and mess hall procurements pursuant to the R–S Act. Defendants' argue that the competition requirements of the CIC Act do not apply to the RS Act because of this provided exception for "procurement procedures otherwise expressly authorized by statute." *Id.*

Plaintiffs, however, also submit that the R–S Act fails to meet the requirements under 10 U.S.C. § 2304(k)(2) of the CIC Act, which provides that a "provision of law may not be construed as requiring a new contract to be awarded to a specified non-Federal Government entity unless that provision" specifically identifies subsection (k), the non-federal entity involved, and specifically states that the award contravenes Congress's award policy set forth in subsection (k)(1). But subsection (k) does not apply to the R–S Act. By its plain terms, the R–S Act does not require the award of cafeteria contracts. Instead, the cafeteria *priority* provision is expressly contingent upon a determination "on an individual basis and after consultation with the head of the appropriate installation, that such operation can be provided at a reasonable cost with food of a high quality comparable to that currently provided employees." 20 U.S.C.A. § 107d–3(e).

■ There is another reason subsection (k) of the CIC Act does not govern the interpretation of the R–S Act: it was enacted after the R–S Act. The general rule is that later-enacted laws to do not declare the meaning of earlier law. *See Almendarez–Torres v. United States,* 523 U.S. 224, 237, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (citing *Federal Housing Admin. v. Darlington, Inc.,* 358 U.S. 84, 90, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958)); *see also O'Gilvie v. United States,* 519 U.S. 79, 90, 117 S.Ct. 452, 136 L.Ed.2d 454 (1996) ("[T]he view of a later Congress cannot control the inter-

pretation of an earlier enacted statute.") (citing *United States v. Price,* 361 U.S. 304, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960), and *Higgins v. Smith,* 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940)). While subsection (k) was enacted in 1994, the R–S Act Amendments in question were passed into law some twenty years earlier—in 1974.

### 4. The Federal Acquisition Regulations

The Federal Acquisition Regulations ("FAR") state that "[t]his authority may be used when statutes, such as the following, expressly authorize or require that acquisition be made from a specified source or through another agency." 48 C.F.R. § 6.302–5(b) (1998). The Plaintiffs point to the omission of any reference to the R–S Act in this portion of the regulations as evidence that the R–S Act does not involve government purchases of goods or services. The operative portion of the FAR, however, makes it clear that the list under 48 C.F.R. § 6.302–5(b) is not exhaustive through its use of the term "*such as* the following." *Id.* (emphasis added). Moreover, the regulations also state that the portions at issue were not intended to apply to contracts "awarded using procedures that are expressly authorized by statute." *Id.* § 6.001(b). The FAR, like the CIC Act, therefore exempt the R–S Act from their coverage via the use of a "savings clause."

### C. *Governmental Support for Inclusion of Military Mess Halls*

In addition to implementing regulations, DOE has been quite clear in expressing its position regarding the applicability of the R–S Act to military mess hall facilities. In an August 1997 memorandum addressing the issue, DOE's Commissioner of the Rehabilitative Services Administration [8] explained that "the Act clearly covers all types of food service operations on military bases, including military troop mess halls."

Memorandum from Frederick K. Schroeder, Commissioner of Rehabilitative Services Administration, to the Committee for Purchase 1 (Aug. 14, 1997) (filed as Defs.' Ex. E). Furthermore, he stated that

> [a]ny attempt to draw a distinction between appropriated funded cafeterias and concession cafeterias is merely a fiction to justify placing full food service activities on the [JWOD Act] Committee's procurement list. There is no basis either in the Act or in the legislative history for [such a] position.

*Id.* at 4.

Similarly, in November 1998, General Counsel of DOD, after considering the plain meaning of the statute, applicable regulations, and other DOE guidance, concluded that "the assertion that the Act does not apply to military dining facilities cannot withstand analysis." Memorandum from Judith A. Miller, General Counsel of DOD, to General Counsels of the Military Departments 4 (Nov. 12, 1998) (filed as Defs.' Ex. D).

Moreover, in one of the only reported cases to have addressed the issue of whether the R–S Act applies to appropriated fund cafeterias, the Comptroller General concluded that an appropriated fund food service contract at an Air Force Base constituted a cafeteria subject to the R–S Act's priorities. *See Matter of: Department of the Air Force—Reconsideration,* 1993 WL 212641 at \*7. After thoroughly considering the statutory language of the Act, the implementing regulations, the 1974 Amendments, and DOE interpretation of its regulations, the Comptroller General found that an Air Force food service contract was "encompassed by the Act and implementing regulations." *See generally id.* at \*4–7.

Although federal case law addressing the relationship between the R–S Act and dining facilities on military bases is limit-

---

**8.** This position was specifically charged by Congress with interpreting the Act and implementing the cafeteria priority. *See* 20

U.S.C.A. § 107(b) (West 2000); *id.* § 107d–3(e); *see also supra* Part III.B.1.

ed, a few federal courts have recognized that the Act applied under similar circumstances to those here. For instance, in *Oklahoma v. United States,* a federal court accepted the DOA interpretation that the Act applied to a mess hall on a United States Army base. *See Oklahoma v. United States,* Civ–96–1734–A, at 3–4 (W.D.Okl. Jan. 7, 1998) (filed as Defs.' Ex. F). More tellingly, in *Southfork Systems v. United States,* the United States Court of Appeals for the Federal Circuit supported application of the Act's "cafeteria" priority to military mess halls. In that case, the United States Air Force sought to contract out the management and operation of a personnel cafeteria complex at a base in Texas. The Texas SLA submitted a competitive bid for the complex pursuant to R–S Act regulations. Adhering to those same regulations, and much to the chagrin of the incumbent operator, the Air Force entered into direct negotiations with the SLA with the intention of awarding the SLA the contract. The Federal Circuit upheld the Air Force's decision to enter into such negotiations, thereby supporting the Air Force's application of the Act to the dining facility in question. *See Southfork Systems, Inc. v. United States,* 141 F.3d 1124, 1127 (Fed.Cir.1998).

Accordingly, the Court holds that addition of the term "cafeteria" to the R–S Act, when viewed in conjunction with the corresponding regulations, governmental support, and available case law, supports the R–S Act's coverage of the dining facilities in question at Fort Lee.

## IV. CONCLUSION

For the reasons stated above, Defendants' and Intervenors' motions for summary judgment pursuant to FRCP 56 are hereby GRANTED. Plaintiffs' motion for summary judgment is DENIED.

The Clerk is directed to forward a copy of this Order to counsel of record.